JACKSON v. GREENVILLE COMPRESS CO.   (No. 1304.)

(Court of Civil Appeals of Texas.   Amarillo. March 27, 1918.)

1. WAREHOUSEMEN ⬤⟿24(1) — COTTON COMPRESS COMPANY—DUTIES.

Although plaintiff did not agree to pay storage, and it was his purpose to sell the cotton stored with defendant compress company without having it compressed, where the cotton was received with the expectation that defendant would be compensated by compress charges paid by the carrier before shipment, defendant was a bailee for hire, whose duty it was to exercise ordinary diligence in caring for the cotton.

2. EVIDENCE ⬤⟿408(7)—WAREHOUSE RECEIPT —IMPEACHMENT BY PAROL.

Ordinarily a warehouseman's receipt is a contract which cannot be impeached by parol testimony.

3. APPEAL AND ERROR ⬤⟿671(6) — MATTERS NOT SHOWN BY STATEMENT OF FACTS—REVIEW.

The terms of the receipt issued by defendant compress company to plaintiff for cotton delivered not being set out in the statement of facts, the court on appeal cannot discuss the effect of the receipt.

4. EVIDENCE ⬤⟿69—LAWFUL BUSINESS—PRESUMPTION.

The presumption is that defendant compress company, with whom plaintiff stored cotton, was doing a lawful business in a lawful way.

5. PLEADING ⬤⟿34(3) — SUFFICIENCY — ABSENCE OF SPECIAL EXCEPTION.

Every reasonable intendment will be indulged in favor of the allegations of plaintiff's petition in the absence of a special exception.

6. WAREHOUSEMEN ⬤⟿34(4)—ALLEGATIONS AS TO RELATION—SUFFICIENCY.

Plaintiff's petition alleging that defendant engaged in the compress business and in connection therewith used extensive platforms in storing and caring for cotton delivered, for which a toll was charged, that, at the request of defendant, plaintiff delivered cotton with the understanding that defendant would accept and com-

press the same in a reasonable time, that there was an agreement to accept the cotton and care for the same, and keep it protected from weather or other damages in consideration of the usual price for compressing cotton, sufficiently showed the relation of bailor and bailee for hire, in the absence of a special exception.

7. WAREHOUSEMEN ⊚⟶24(1) — COTTON COMPRESS COMPANIES—DUTIES.

Where defendant accepted the cotton in connection with its compress business on storage for mutual benefit of both parties, it was not necessary to prove express contract, the law implying a contract and imposing on defendant the duty to use ordinary care.

8. APPEAL AND ERROR ⊚⟶960(3) — STRIKING TRIAL AMENDMENT—DISCRETION.

Although court on appeal reaches conclusion that first paragraph of plaintiff's trial amendment did not set up a new cause of action, where no abuse of discretion is shown in striking out the amendment it will not be held that there was error.

9. LIMITATION OF ACTIONS ⊚⟶127(17)—TRIAL AMENDMENT—NEW CAUSE OF ACTION.

Where plaintiff's original petition alleged that defendant agreed to accept, care for, and keep the cotton delivered by plaintiff, and compress it within a reasonable time, trial amendment alleging that defendant agreed to open the bales and separate the good cotton from the damaged set up a new cause of action within the statute of limitations.

Appeal from District Court, Hunt County; Wm. Pierson, Judge.

Suit by F. W. Jackson against the Greenville Compress Company. Judgment for defendant, and plaintiff appeals. Reversed.

Evans & Shields, of Greenville, and G. R. Smith, of McKinney, for appellant. Clark & Sweeton, of Greenville, for appellee.

HUFF, C. J. The appellant, Jackson, instituted this suit against the appellee compress company for damages alleged to have been sustained to 157 bales of cotton by reason of negligence, in that it "failed and neglected to compress said cotton until in the month of March or April, 1914, and in the meantime and while in the possession of said cotton negligently and carelessly permitted said cotton to become exposed to the weather, rain, and damp ground or damp platform, injuring said cotton in the bales by rotting the same and in the loss of weight, as follows" (setting out the grounds of injury), and the following allegations were made:

"(2) Plaintiff shows that the defendant at this time is engaged in the business of compressing cotton for the public, and has been so engaged for many years next preceding the filing of this petition; that defendant's compress is located in the city of Greenville, and that in connection with its compress it has an extensive platform, covered with shingles, used for the purpose of storing and caring for cotton that is delivered to the defendant for the purpose of being compressed, said defendant charging a toll of so much for each bale compressed.

"(3) That between the dates of the 15th of September, 1913, and the 1st day of January, 1914, the plaintiff, at the request and solicitation of the defendant, delivered to the defendant from his home in Collin county, Texas, to the compress of the defendant in Greenville, Texas, one hundred fifty-seven (157) bales of cotton, with the understanding that the defendant would accept said cotton and compress the same in a reasonable length of time thereafter, and from the time the cotton was received until the same was compressed and delivered back to plaintiff the said defendant, acting by and through its authorized agent and general manager, W. B. Wyse, contracted and agreed to accept said cotton at its compress, and to care for the same, and keep it protected from the weather or other damage, and that in consideration therefor the defendant was to receive the usual prices for compressing cotton; that at the time of accepting plaintiff's cotton, and at all times subsequent thereto, while in the possession of said cotton defendant was bailee for hire and liable to plaintiff for the safe-keeping of his cotton."

It appears after the introduction of the evidence the appellant filed a trial amendment, alleging substantially that at the time he arranged to ship the cotton to appellee it was agreed and understood by both parties, or was within their contemplation, that the cotton was to be accepted and stored upon appellee's platform, to be cared for and protected against danger of loss until such time as appellant might conclude to sell same, at which time the cotton would necessarily have to be compressed before it could be shipped; that this was the custom and usage of appellee in the management of the compress, and that each acted upon the same, in consideration, among other things, appellee would have the privilege of compressing said cotton and be paid the sum of 50 cents per bale by the railway; that it undertook and agreed, expressly or impliedly, to accept, store, preserve, and care for said cotton during the time it was in appellee's possession, notwithstanding which appellee negligently permitted the cotton to be exposed, and failed and neglected to turn it, etc. It is further alleged after the cotton was delivered, and while in possession of appellee, that on the 4th day of March, 1914, appellee, for a valuable consideration, contracted and agreed to condition said cotton—that is to say, open said bales and separate the good cotton from the damaged out of the 157 bales then in the possession of appellee; that appellee neglected and failed to condition the cotton until April 6th thereafter, permitting the damaged cotton to remain in the bales, and as a result appellant suffered loss to his cotton in the sum of $1,000, etc.

The appellee excepted to the trial amendment so filed on the grounds (1) that it alleges an implied contract and the suit was brought upon an express contract, and that no implied contract was alleged until more than two years after the alleged cause of action; (2) to all that which claims anything except the right to recover on an express contract of bailment, because barred by the two-year statute of limitation, especially the new contract alleged to have been made March, 1914; (3) that the trial amendment was filed after the close of the evidence, and comes too late, and because the attempted

cause of action was barred by the statute of limitation. The order of the court on the exception recites after the close of the evidence, and while the argument was in progress, upon appellee's request for an instructed verdict, appellant was granted leave to file a trial amendment, after which appellee was granted and did file its supplemental answer, and that the court sustain the exceptions therein contained, etc. The trial court, after sustaining the exception striking out the trial amendment, instructed a verdict for the appellee.

The appellee was a compress company, receiving and compressing cotton. The appellant had cotton at his home town, and he called up the superintendent of appellee over the phone, and told him that he had cotton, and that he had concluded he would ship it to the platform of appellee, and if the company would take care of it he would ship the cotton, and received the reply, "Yes, I will be glad to do it, and am prepared to take care of 10,000 bales more;" and appellant told him all right, that he would ship that cotton and possibly later some more. The superintendent testified as to the conversation had with appellant, stating that appellant asked him if they were able to handle some cotton, and that he told appellant they could handle the cotton. "He wanted to know if we could store his cotton for him—some cotton he had up there at Renner, or somewhere. He wanted to ship it in and store it at the Greenville compress. He knew the facilities we had for storing; he had seen the premises." There was nothing said in that conversation about caring for the cotton or compensation for the services. It is established, we think, by the facts, that appellant desired to ship the cotton and place it on the platform of appellee to get the cotton off the ground and near to a market, and it was his purpose to sell the cotton without himself having it compressed. There was no consideration agreed upon for storing. The facts will warrant the finding that appellant had previous thereto shipped his cotton and stored it as he did the particular lot in question. The assistant superintendent, Williams, testified:

"Yes, sir; we turned it because it is customary to do it and necessary to protect the cotton. That was as far as we were able to protect it. You can't always prevent damages, even by turning. I don't think if you turn it at the proper time and often enough you can prevent damages. As to whether it would go from eighteen to twenty inches from one end if we turned it as often as necessary to turn it, you have your damage distributed on the various parts of the bale. As to whether or not how often we turned it depends on the room, we had to turn it end up would have anything to do with it. We turned it as often as convenient and possible to get to it and handle it. At that time the only opportunity the compress had of getting anything out of cotton was by compressing it, and the railroads paid that. We get ten cents a hundred pounds for compressing cotton where it is fixed by the railroad commission, which would be approximately fifty

cents a bale. I think every bale of this cotton was compressed except the damaged part wasn't compressed, and that we compressed we got ten cents a hundred pounds out of the railroad company for it; that is the way the compress company made their money. Yes; it is true that we provided large facilities for storing cotton there because it increased our facilities for compressing it. Yes; it was a rare occurrence if a man had some cotton there for him to take some wagons and haul it away. When cotton was put there the chances are we would have a chance to compress it. We tried to take care of every bale of cotton, and have always done that when we didn't have the proper facilities. Yes; we knew when cotton was brought there it was uncertain as to how long it remained, because it was never compressed until the party that sent it there sold it. Some cotton comes there for about three hours, and we got as much for cotton that comes there as cotton that stays six months. We never compressed it until it was ready to be shipped, and then we compressed it and put it in the train because we didn't store compressed cotton. We kept our platform for the purpose of handling cotton. When cotton is put in an out-bound bill of lading it is blocked up. The number of men we have down there varies; it runs from seventy-five to a hundred and twenty-five and sometimes a few more. When people put their cotton down there I don't really consider it is a duty to have those men turn this cotton as often as necessary to prevent damage. As far as possible we have been doing it; we have always done it as far as possible. I don't recall having ever done that before for Mr. Jackson. The past two seasons he may not have had it there at the time of year when it was necessary to do anything. I don't remember when the rains set in in 1914 exactly; you can get the weather record."

[1] The facts will warrant the finding that all cotton received by the compress was received in the same way, and with the expectation of being compensated by compress charges paid by the railroad; that the compress cared for and turned the cotton while on its platform; and there is some evidence to the effect that it had not been properly attended to in this case, and that as a result it was damaged. Under these facts we are inclined to believe the compress company was a bailee for hire, and, if so, the duty of ordinary care was imposed on it to care for and handle the cotton while stored with it. "The storage of the cotton was an incident to its compression, and it was the duty of the compress company to exercise ordinary care in the storage of the same." Loeb Compress Co. v. Bromberg & Co., 140 S. W. 475. It was said in that case:

"The benefit accruing from this reciprocal bailment to Bromberg & Co. was that their cotton should be sampled, marked, stored, and protected, and the benefit to the Loeb Compress Company was that it should have the privilege of compressing the cotton, rather than have another compress at some other point along the line of the shipment enjoy this privilege, and collect from the railroad company fifty cents per bale for the compression; also the charge for loading the cotton, which was to be paid by the railroad company."

See authorities cited in that case; also Sherman Ice Co. v. Klein, 195 S. W. 918, and authorities cited.

The relation of the parties in this case im-

posed the obligation upon the compress company of a bailee, which was for the mutual benefit of the parties, and it was required to exercise ordinary diligence in the care of the cotton stored. 4 Elliott on Contracts, § 3100. In this case the compress company appears to have issued a receipt for the cotton.

[2] Ordinarily a warehouseman's receipt is a contract which cannot be impeached by parol testimony. 4 Elliott on Contracts, § 3099.

[3] The terms of this receipt, however, are not set out in the statement of facts; hence we cannot discuss its effect. The facts, we think, are sufficient to show the cotton was delivered and accepted by a warehouse whose compensation for compression was fixed by law; that as a compress it was engaged in the business of receiving on storage cotton, with the prospect of being reimbursed for such services by compressing the cotton before it should be shipped. The parties dealt in this case as was the usual method and custom with this compress in such matters.

[4] The presumption is that appellee was doing a lawful business, and in a lawful way, under lawful authority. The law imposed upon it certain duties with reference to cotton in its care. If the petition in this case was good upon general demurrer, the court was in error in instructing a verdict.

[5] Every reasonable intendment will be indulged in favor of the allegation in the absence of a special exception.

[6] It is alleged the appellee was engaged in the compress business, and in connection therewith it used extensive platforms for storing and caring for cotton delivered to it to be compressed, for which a toll was charged; that at the request of appellee appellant delivered the cotton, with the understanding that the appellee would accept said cotton and compress the same in a reasonable time; that there was an agreement to accept the cotton and care for same, and keep it protected from the weather or other damages, in consideration of the "usual price for compressing cotton;" that at such time appellee was a bailee for hire.

The relation of bailor and bailee was alleged, we think, by the facts stated in the petition, and that the consideration was the usual charges for compression.

[7] It is not required of appellant to prove an express contract to care for and protect the cotton, and when appellee accepted the cotton in connection with its compress business on storage, for the mutual benefit of the parties, the law implied a contract, and imposed the duty on appellee to use ordinary care with reference to the care and protection of the cotton. We believe the original petition was sufficient to admit the evidence of the relation above set out, in the absence of a special exception. The court was therefore in error in instructing a verdict,

but should have submitted the issues to the jury.

[8] We have concluded that the first paragraph of the trial amendment did not set up a new cause of action, but alleged with more particularity the facts constituting the acceptance of the cotton, and more particularly the manner in which appellee was to be remunerated, setting up also the custom and method of appellee in receiving and storing cotton in connection with the compress. However, the court, doubtless acting on its discretion, struck out the trial amendment, and, as no abuse of that discretion is here shown, we cannot hold that there was error.

[9] As to the second paragraph of the trial amendment—that is the one setting up a contract of March 4, 1914, to "condition" the cotton—we believe sets up a new cause of action, and, under the facts and pleadings in this case, shows to have been barred by the two-year statute of limitation. For that reason the court properly struck out that part of the trial amendment.

The judgment will be reversed for the reasons above stated.